IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **MID-CENTURY INSURANCE COMPANY,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Civil Action No. 1:24-cv-00035-KD-B** |
| **CHASE STAFFORD,** | ) | |
| **Defendant.** | ) | |

## ORDER

This action is before the Court on Plaintiff Mid-Century Insurance Company's ("Mid-Century") Motion for Summary Judgment (Doc. 31); Defendant Chase Stafford's ("Stafford") Motion for Summary Judgment (Doc. 33); Mid-Century's Response (Doc. 35) and Reply (Doc. 37); and Stafford's Response (Doc. 36) and Reply (Doc. 38).

### I.       Findings of Fact

The "facts," as accepted at the summary judgment stage, "may not be the actual facts of the case." Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013). For the purposes of summary judgment, the undisputed facts follow:

On July 19, 2022, Stafford was involved in a car accident in Georgia while driving his mother's car—a 2008 Chevrolet Impala. (Doc. 31 at 2 ¶ 1; Doc. 31-1 (Accident Report); Doc. 33 at 2 ¶ 1; Doc. 35 at 1 ¶ 1). At the time of the accident, Stafford was residing with his mother (Sheree M. Brush) at her home in Alabama. (Doc. 31-2 at 6 ¶ 12–14 (EUO of Stafford); Doc. 33 at 2 ¶ 2; Doc. 35 at 1 ¶ 2). Stafford's mother held an insurance policy ("Policy") written by Mid-Century, which listed the 2008 Chevrolet Impala as an insured vehicle and Stafford as a covered driver. (Doc. 1 at 2 ¶ 4; Doc. 19 at 1 ¶ 4; Doc. 31-5 at 4 (Policy); Doc. 33 at 2 ¶ 3; Doc. 35 at 1 ¶ 3). The Policy

provided uninsured/underinsured motorist coverage ("UIM") of $50,000 per person and $100,000 per accident. (Doc. 1 at 2 ¶ 4; Doc. 1-3; Doc. 19 at 1 ¶ 4; Doc. 31-5 (Policy)). The Policy listed two vehicles, totaling up to $100,000 in potential UIM coverage. (Doc. 1 at 2 ¶ 4; Doc. 1-3; Doc. 19 at 1 ¶ 4; Doc. 31-5 (Policy)).

On November 15, 2022, Stafford sent a demand letter to Mid-Century requesting uninsured/underinsured motorist compensation under the Policy. (Doc. 1 at 2 ¶ 4; Doc. 1-4 (Demand Letter); Doc. 19 at 1 ¶ 4). The letter stated: "**[I]t has become clear that the at-fault party's bodily injury coverage is inadequate to fully compensate for the damages incurred.**" (Doc. 1-4 at 3 (Demand Letter)).

On March 14, 2023, Stafford settled with the tortfeasor for $25,000. (Doc. 31-2 at 7 (EUO of Stafford); Doc. 31-3 (Limited Release); Doc. 33 at 2 ¶ 4; Doc. 35 at 2 ¶ 4). Stafford signed a Georgia Limited Liability Release ("Release" or "Limited Release") pursuant to O.C.G.A. § 33-24-41.1. (Doc. 31-3 (Release); Doc. 33 at 2 ¶ 5). The Limited Release released the tortfeasor "and their successors and assigns, heirs, executors, administrators, insurers, and all other persons, firms, corporations" (collectively referred to as Releasees) from "any and all bodily injury and personal injury claims, demands, rights, and causes of action" arising from the accident. (Doc. 31-3 at 2 (Release)). But the Release was limited and expressly preserved "any claims of subrogation that any uninsured or underinsured motorist carrier may have against the Releasees." (Id.). The Release also contained a provision stating: "The Undersigneds acknowledge and represent that this Limited Release and all its terms and provisions are to be construed in accordance with the Law of the State of Georgia." (Id.).

After settling his claim against the tortfeasor, Stafford submitted a claim for underinsured motorist benefits coverage under the Mid-Century Policy. (Doc. 1 at 2 ¶ 4; Doc. 1-3; Doc. 19 at 1

¶ 4; Doc. 31-5 (Policy); Doc. 33 at 3 ¶ 7; Doc. 35 at 2 ¶ 7). Mid-Century alleges that Stafford did not provide notice or request permission before settling his claim—citing Stafford's EUO, (Doc. 31-2 at 8–9),[1] and an affidavit of Mid-Century's claims handler (Doc. 31-4).[2] Stafford's response in opposition to Mid-Century's motion for summary judgment admits that Mid-Century alleges this but does not admit or deny the truth of the statement. (Doc. 36 at 3 ¶ 6).

On February 6, 2024, Mid-Century filed an action against Stafford in this Court. (Doc. 1). Mid-Century seeks a declaratory judgment that there is no underinsured motorist coverage under the Policy. (Doc. 1 at 3). On March 27, 2024, Stafford answered and filed a counterclaim alleging a violation of Alabama's underinsured motorist coverage law, Ala. Code § 32-7-23(b)(4). (Doc. 19).

After the parties' Joint Rule 26(f) Report of Planning Meeting, (Doc. 22), this Court instructed the parties to file motions for summary judgment addressing the primary question of whether coverage is owed under the Policy. (Doc. 30 at 1). On June 10, 2024, Mid-Century and Stafford filed motions for summary judgment. (Doc. 31; Doc. 33). On July 1, 2024, both parties filed responses. (Doc. 35; Doc. 36). On July 8, 2024, both parties filed replies. (Doc. 37; Doc. 38).

## II.    Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome" of the case. Anderson v. Liberty Lobby,

---

[1] Stafford did not admit to this in his EUO. When asked whether he provided Mid-Century with a copy of the Release before signing it, Stafford responded: "I don't know." (Doc. 31-2 at 8 (EUO of Stafford)). When asked whether he asked Mid-Century for permission to settle his claim pursuant to the Release, Stafford responded: "I don't know." (Id.).

[2] The affidavit cited by Mid-Century does not reference whether Stafford gave notice or requested permission. (Doc. 31-4 (Affidavit)).

Inc., 477 U.S. 242, 248 (1986). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute of material fact exists. Id.

The party moving for summary judgment "bears the initial burden of demonstrating the absence of a genuine dispute of material fact." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011). The movant meets this burden by identifying affirmative evidence (pleadings, depositions, answers to interrogatories, admissions on file, etc.) to support its claim that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A). If the nonmovant bears the burden of persuasion at trial, the movant may also make a prima facie showing of summary judgment by demonstrating that the nonmovant's evidence is insufficient to establish an essential element of its claim. Grange Mut. Cas. Co. v. Slaughter, 958 F.3d 1050, 1057 (11th Cir. 2020); Fed. R. Civ. P. 56(c)(1)(B).

If the movant meets its burden under Rule 56(c), summary judgment will be granted unless the nonmovant offers some competent evidence that could be presented at trial showing that there is a genuine dispute of material fact. Celotex, 477 U.S. at 324. If the movant met its burden by pointing "to specific portions of the record . . . to demonstrate that the nonmoving party cannot meet its burden of proof at trial," the nonmovant must "go beyond the pleadings" to designate specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(e).

When assessing a summary judgment motion, the court's function is not to make "credibility determinations" and "weigh the evidence." Anderson, 477 U.S. at 248. Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." FindWhat, 658 F.3d at 1307. Thus, summary judgment is only proper when a movant shows that no reasonable jury could find for the nonmovant—even when the evidence and inferences are drawn in the nonmovant's favor.

The summary judgment standard is "not affected by the filing of cross-motions for summary judgment." Mobile County Water, Sewer & Fire Prot. Auth., Inc. v. Mobile Area Water & Sewer Sys., 567 F. Supp. 2d 1342, 1348 (S.D. Ala. 2008). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting Bricklayers, Masons & Plasterers International Union v. Stuart Plastering Co., 512 F.2d 1017, 1023 (5th Cir. 1975)). Yet, "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts." Godard v. Alabama Pilot, Inc., 485 F. Supp. 2d 1284, 1291 (S.D. Ala. 2007).

### III.    Analysis

The central question of these cross-motions for summary judgment is whether underinsured motorist coverage is owed under the Policy. Mid-Century argues that coverage is not owed because Stafford failed to provide Mid-Century with notice of the settlement and obtain Mid-Century's consent. (Doc. 31). Stafford argues that coverage is owed because the Policy did not require notice before settling with a tortfeasor and because Stafford preserved Mid-Century's subrogation rights in the Limited Release. (Doc. 33).

Neither party disputes that Mid-Century's Policy governs. (Doc. 31 at 3; Doc. 36 at 5). Neither party disputes that Alabama's choice-of-law principles apply and that Alabama law applies to the interpretation of the Policy. (Doc. 31 at 6–7, Doc. 33 at 4). The relevant parts of the Policy provide:

> ***Definitions Used Throughout This Policy***
> . . . .
> C. **You** and **your** mean the **named insured** shown on the **Declarations Page** and **your** spouse, if a resident of **your** household.
> D. **Definitions**
> . . . .

9. **Family member** means a person who resides with **you** and who is related to **you** by blood, marriage or adoption, including a ward or a foster child. This also includes a minor in the custody of **you** or of a person related to you who resides with you.

. . . .

*Part II - Uninsured Motorist Coverage*

**Uninsured Motorist Bodily Injury (Including Underinsured Motorist Coverage)**

A. **Insuring Agreement - Uninsured Motorist Bodily Injury Coverage**

1. If a limit for this coverage is shown on **your Declarations Page, we** will pay **damages** an **insured person** is legally entitled to recover from the owner or operator of **an uninsured motor vehicle** because of **bodily injury** sustained by an **insured person**, caused by an accident, and arising out of the ownership, maintenance or use of an **uninsured motor vehicle.**

2. **We** will pay under this coverage only after the limits of bodily injury liability under all liability policies applicable to an **uninsured motor vehicle** have been exhausted by payment of judgments or settlements.

B. **Additional Definitions Used In This Part Only**

. . . .

2. **Insured person** in Part II means:

a. **You** or any **family member**;

. . . .

D. **Additional Duties for Part II - Uninsured Motorist Coverage**

An **insured person** must comply with the following provisions:

1. Any judgment or settlement for **damages** against an owner or operator of an **uninsured motor vehicle** that arises out of a lawsuit brought without **our** written consent is not binding on **us** unless **we**:

a. Received from the **insured person** reasonable notice of the suit that resulted in the judgment; and

b. Had a reasonable opportunity to protect **our** interests in the suit.

2. When the **insured person** informs **us** of a settlement offer, if any, proposed by or on behalf of the owner or driver of the **uninsured motor vehicle**, the **insured person** must request **our** written consent to accept such settlement offer.

a. If we consent in writing, then the **insured person** may accept such settlement offer.

b. If we inform the **insured person** in writing that **we** do not consent, then the **insured person** may not accept such settlement offer and:

(1) **We** will make payment to the **insured person** in an amount equal to such settlement offer. This payment is considered a payment made by or on behalf of the owner or driver of the **uninsured motor vehicle**; and

(2) Any recovery from or on behalf of the owner or driver of the **uninsured motor vehicle** shall first be used to repay **us**.

3. An **insured person** must take all necessary steps to protect **our** right of subrogation, which may include the filing of a suit against an uninsured

> motorist. Any suit filed by an **insured person** must be filed within the applicable statute of limitations. If **we** make a payment and the **insured person** recovers from another party, the **insured person** shall hold the proceeds in trust for **us** and pay **us** back the amount **we** have paid.
>
> . . . .
>
> 5.  Any action brought against us pursuant to this coverage must be brought in the county in which the person seeking benefits resides or in the United States District Court serving that county.

(Doc. 31-5 at 9, 14–16).

Under Alabama law, "[a]n insurer may contract with its insured upon conditions expressed in its policy, limited only by statute and public policy. The insured, by acceptance of a policy, is deemed to have approved it with all conditions and limitations expressed therein which are reasonable and not contrary to public policy." Turner v. State Farm Mut. Auto. Ins. Co., 310 So. 3d 354, 358 (Ala. 2020) (quoting Gulf American Fire & Cas. Co. v. Gowan, 218 So. 2d 688, 693 (Ala. 1969)).

### A.  Mid-Century's Motion for Summary Judgment

Mid-Century argues that Stafford's failure to notify Mid-Century of his proposed settlement with the tortfeasor was a violation of the Policy and Alabama law, which precludes his claim for underinsured motorist benefits. (Doc. 31 at 8). As an initial matter, Mid-Century claims that Stafford's "settlement was done without the consent and with no notice to Mid-Century." (Doc. 31 at 8). Stafford's response to Mid-Century's motion for summary judgment does not deny that he failed to give notice of the settlement and failed to obtain Mid-Century's consent. (Doc. 36). Stafford merely repeats Mid-Century's allegation: "Mid-Century alleges that Mr. Stafford did not inform Mid-Century of the settlement with the tort-feasor prior to entering into the settlement and did not receive permission from Mid-Century to effectuate the release." (Doc. 36 at 3 ¶ 6).

"If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed

for purposes of the motion . . . ." Fed. R. Civ. P. 56(e)(2). "The Court will deem uncontroverted material facts to be admitted solely for the purpose of deciding the motion for summary judgment." S.D. Ala. CivLR. 56(d). The fact that Stafford failed to provide notice to Mid-Century before entering the settlement agreement is uncontroverted. Therefore, this fact is admitted solely for the purpose of deciding this motion.

### 1. The Policy's requirements

Mid-Century summarily argues that Stafford's failure to notify Mid-Century of his proposed settlement and to obtain Mid-Century's consent precludes his coverage under the Policy. (Doc. 31 at 8). Stafford's response argues that the Policy does not require that Stafford inform Mid-Century of any proposed settlement. (Doc. 35 at 6). "At best, the policy requires Mr. Stafford to request Mid-Century's written consent to accept a settlement offer, when—and only when—Mr. Stafford chooses to inform Mid-Century" of a proposed settlement offer. (Id.).

The issue is whether Mid-Century's Policy requires Mid-Century's consent to settle with a tortfeasor. Under Alabama law, insurance policies are governed by the general rules of contracts and interpretation. Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co., 817 So. 2d 687, 691 (Ala. 2001). "Insurance companies are entitled to have their policy contract enforced as written." Id. Courts must construe them to give effect to the parties' intent by reading "each phrase in the context of all other provisions." Id. If a policy is clear, then there is no question of interpretation. Id. at 692. Ambiguities in a policy "should be resolved against the insurer," but "ambiguities are not to be inserted by strained or twisted reasoning." Id. The fact that the parties interpret the policy differently does not make the policy unclear. Id. If there is a disagreement over the ambiguity of the policy, the court must "construe the language according to the meaning that a person of ordinary intelligence would reasonably give it." Id.

The relevant provisions of the Policy provide:

> D. **Additional Duties for Part II - Uninsured Motorist Coverage**
> An **insured person** must comply with the following provisions:
> 1. Any judgment or settlement for **damages** against an owner or operator of an **uninsured motor vehicle** that arises out of a lawsuit brought without **our** written consent is not binding on **us** unless **we**:
>    c. Received from the **insured person** reasonable notice of the suit that resulted in the judgment; and
>    d. Had a reasonable opportunity to protect **our** interests in the suit.
> 2. When the **insured person** informs **us** of a settlement offer, if any, proposed by or on behalf of the owner or driver of the **uninsured motor vehicle**, the **insured person** must request **our** written consent to accept such settlement offer.
>    a. If we consent in writing, then the **insured person** may accept such settlement offer.
>    b. If we inform the **insured person** in writing that **we** do not consent, then the **insured person** may not accept such settlement offer and:
>       (1) **We** will make payment to the **insured person** in an amount equal to such settlement offer. This payment is considered a payment made by or on behalf of the owner or driver of the **uninsured motor vehicle**; and
>       (2) Any recovery from or on behalf of the owner or driver of the **uninsured motor vehicle** shall first be used to repay **us**.
> 3. An **insured person** must take all necessary steps to protect **our** right of subrogation, which may include the filing of a suit against an uninsured motorist. Any suit filed by an **insured person** must be filed within the applicable statute of limitations. If **we** make a payment and the **insured person** recovers from another party, the **insured person** shall hold the proceeds in trust for **us** and pay **us** back the amount **we** have paid.

(Doc. 31 at 5; Doc. 31-5 at 15).

"[E]ach phrase" must be read "in the context of all other provisions." <u>Twin City Fire Ins. Co.</u>, 817 So. 2d at 691. Among the relevant provisions, the Policy clearly requires reasonable notice of a lawsuit against an uninsured motorist tortfeasor. (Doc. 31-5 at 15 ¶ 1). The Policy also clearly requires that Stafford provide Mid-Century with a reasonable opportunity to protect its interests in the suit. (<u>Id.</u>). And the Policy clearly requires that Stafford "must take all necessary steps to protect [Mid-Century's] right of subrogation . . . ." (<u>Id.</u> ¶ 3).

Still, the parties disagree over whether the Policy requires Mid-Century's consent to settle other than when the insured informs Mid-Century of a settlement offer. (Doc. 35 at 6). Because of the disagreement over a provision of the Policy, the Court must "construe the language according to the meaning that a person of ordinary intelligence would reasonably give it." Twin City Fire Ins. Co., 817 So. 2d at 692. Ambiguities in a policy "should be resolved against the insurer," but "ambiguities are not to be inserted by strained or twisted reasoning." Id.

The only reasonable interpretation of the Policy is that Mid-Century's Policy requires consent to settle with an uninsured motorist tortfeasor. If the Policy were interpreted as urged by Stafford, an insured would not be required to obtain Mid-Century's consent to settle a case unless the insured chose to inform Mid-Century of the proposed settlement. This outcome would be nonsensical. An insurer that gives notice would have to wait for Mid-Century's consent before settling. But an insurer that does not give notice could settle without Mid-Century's consent. Moreover, Stafford's interpretation is inconsistent with Policy as a whole. While the provision in question is awkwardly worded, the directive of "[w]hen the insured person informs us of a settlement offer" implies that the insured is required to inform the insurer of a settlement offer in order to comply with the Policy. (Doc. 31-5 at 15). Therefore, the Policy unambiguously required Mid-Century's consent before settling. And Stafford's failure to obtain Mid-Century's consent was a violation of the Policy.

However, this does not resolve the issue. Stafford, by accepting the Policy, "is deemed to have approved it with all conditions and limitations expressed therein which are reasonable and not contrary to public policy." Turner, 310 So. 3d at 358 (quoting Gowan, 218 So. 2d at 693). "However, as a matter of public policy, [the Alabama Supreme Court] has held that an injured party's settlement with a tortfeasor without the consent of the injured party's UIM insurance carrier does not necessarily preclude the injured party from recovering UIM benefits." Id. at 359.

Therefore, the question remains: Does Stafford's failure to obtain Mid-Century's consent before settling preclude Stafford from recovering UIM benefits under Alabama law?

### 2. Alabama law's public policy

Mid-Century argues that Stafford's alleged failure to notify Mid-Century "that his damages might exceed the tortfeasor's limit of liability coverage" and failure to provide "adequate notice of the proposed settlement" violated Alabama law. (Doc. 31 at 8). Mid-Century concludes that, by failing to provide notice, "Stafford has forfeited his right to claim underinsured motorist benefits under the policy." (Doc. 31 at 15). Moreover, Mid-Century argues that it was "not given an opportunity to determine whether it would consent to the settlement with the tortfeasor, waive subrogation, or 'front' the proffered sums with respect to the tortfeasor thus relieving it of the obligation to incur attorney fees." (Doc. 31 at 15). In support, Mid-Century cites to Lambert v. State Farm Mut. Auto. Ins. Co., 576 So. 2d 160 (Ala. 1991).

In Lambert, the Alabama Supreme Court determined that consent-to-settle clauses were not necessarily void under Alabama law. 576 So. 2d at 166. However, the Lambert Court recognized that consent-to-settle clauses should be limited by "both legal and equitable principles" to balance competing concerns: the insured's right to settle and the insurer's right to subrogation. Id. The court provided "general rules [that] should apply" when resolving this conflict. Id. at 167.

> (1) The insured, or the insured's counsel, should give notice to the underinsured motorist insurance carrier of the claim under the policy for underinsurance benefits as soon as it appears that the insured's damages may exceed the tortfeasor's limits of liability coverage.[3]
>
> (2) If the tort-feasor's liability insurance carrier and the insured enter into negotiations that ultimately lead to a proposed compromise or settlement of the insured's claim against the tort-feasor, and if the settlement would release the tort-feasor from all liability, then the insured, before agreeing to the settlement, should immediately notify the underinsured motorist insurance carrier of the proposed settlement and the terms of any proposed release.

---

[3] The evidence indicates that Stafford provided notice to Mid-Century. (Doc. 1-4 at 3).

(3) At the time the insured informs the underinsured motorist insurance carrier of the tort-feasor's intent to settle, the insured should also inform the carrier as to whether the insured will seek underinsured motorist benefits in addition to the benefits payable under the settlement proposal, so that the carrier can determine whether it will refuse to consent to the settlement, will waive its right of subrogation against the tort-feasor, or will deny any obligation to pay underinsured motorist benefits. If the insured gives the underinsured motorist insurance carrier notice of the claim for underinsured motorist benefits, as may be provided for in the policy, the carrier should immediately begin investigating the claim, should conclude such investigation within a reasonable time, and should notify its insured of the action it proposes with regard to the claim for underinsured motorist benefits.

(4) The insured should not settle with the tort-feasor without first allowing the underinsured motorist insurance carrier a reasonable time within which to investigate the insured's claim and to notify its insured of its proposed action.

(5) If the uninsured motorist insurance carrier refuses to consent to a settlement by its insured with the tort-feasor, or if the carrier denies the claim of its insured without a good faith investigation into its merits, or if the carrier does not conduct its investigation in a reasonable time, the carrier would, by any of those actions, waive any right to the subrogation against the tort-feasor or the tort-feasor's insurer.

(6) If the underinsured motorist insurance carrier wants to protect its subrogation rights, it must, within a reasonable time, and, in any event before the tort-feasor is released by the carrier's insured, advance to its insured an amount equal to the tort-feasor's settlement offer.

Lambert, 576 So. 2d at 167.

Importantly, the Lambert Court made several clarifications regarding this analysis. First, "any procedure must take into consideration the facts and circumstances of each individual case." Id. Second, "[t]hese general guidelines should be applied with the understanding [of] the purpose of consent-to-settle clauses in the uninsured/underinsured motorist insurance context." Id. That purpose is "to protect the underinsured motorist insurance carrier's subrogation rights against the tort-feasor, as well as to protect the carrier against the possibility of collusion between its insured and the tortfeasor's liability insurer at the carrier's expense." Id.

Mid-Century argues that Stafford violated <u>Lambert</u>'s general rules by failing to provide notice of the proposed settlement and obtain Mid-Century's consent before settling. (Doc. 31 at 9). Stafford responds by arguing that the Release protected Mid-Century's subrogation rights, which means "<u>Lambert</u>'s notice procedure is inapplicable." (Doc. 36 at 9). Stafford also argues the <u>Lambert</u> rules are the "ceiling of what consent-to-settle provisions in underinsured motorist policies may require of an insured concerning notice of a potential settlement with a tort-feasor— not the floor." (Doc. 36 at 9).

Guided by <u>Lambert</u>, this Court must limit consent-to-settle clauses with "legal and equitable principles" to ensure that Stafford receives the benefit of his bargain and that Mid-Century's subrogation rights are protected. <u>Lambert</u>, 576 So. 2d at 166. In applying <u>Lambert</u>'s general guidelines, this Court must keep in mind that the purpose of consent-to-settle clauses is to protect the insurance carrier's subrogation rights against the tortfeasor and to protect the carrier against the possibility of collusion. <u>Id.</u> at 167. And this Court must consider "the facts and circumstances" of the case. <u>Id.</u>

When following this procedure, some <u>Lambert</u> rules may be inapplicable. For example, in <u>Aetna Cas. & Sur. Co. v. Turner</u>, the Alabama Supreme Court concluded that <u>Lambert</u>'s rule requiring the insurer to pay its insured the settlement amount before releasing the tortfeasor "would serve no purpose" under the facts of the case. 662 So. 2d 237, 241 (Ala. 1995) ("We find no reason why [the insurer] should have paid [its insured] an amount equal to the settlement offered by [the tortfeasor] in order to preserve its subrogation rights, under the facts of this case.").

In <u>Aetna Cas. & Sur. Co. v. Turner</u>, the trial court granted summary judgment for the insurer, determining that the insured was not entitled to underinsured benefits under the policy. <u>Id.</u> This decision was reversed "*after* [the tortfeasor] had been released." <u>Id.</u> Therefore, the Alabama

Supreme Court found "no reason why [the insurer] should have paid" the insured before the settlement "in order to preserve its subrogation rights." Id. This case clearly supports two propositions. First, certain Lambert rules may be inapplicable based on the facts of the case. Second, an insurer's subrogation rights may be preserved despite a failure to pay its insured before the insured's settlement with the tortfeasor.

Here, Stafford failed to provide Mid-Century with notice of his settlement with the tortfeasor. But the Limited Release with the tortfeasor purportedly preserved Mid-Century's subrogation rights. The issue is whether Mid-Century's subrogation rights are, in fact, preserved. If Mid-Century's subrogation rights are preserved, then Stafford's settlement complies with the purpose of consent-to-settle clauses as explained in Lambert.

Mid-Century argues that "[o]nce Stafford released his rights, there were no rights left for Mid-Century to subrogate against." (Doc. 37 at 7). Generally, "[r]eleasing the uninsured or underinsured tortfeasor will defeat the uninsured/underinsured motorist insurer's subrogation rights." 1 Angela K. Upchurch, Releases, covenants not to sue, exculpatory clauses, and limitation of liability clauses or agreements, Ala. Pers. Inj. & Torts § 3:29 (2023 ed.). However, that is not what happened in this instance.

The Limited Release was granted in a Georgia lawsuit and pursuant to a Georgia law, O.C.G.A. § 33-24-41.1. (Doc. 31-3). It provides that "this Limited Release and all its terms and provisions are to be construed in accordance with the Law of the State of Georgia." (Doc. 31-3 at 2). Under Georgia law, "[a] limited release obtained pursuant to O.C.G.A. section 33-24-41.1 does not operate to extinguish an uninsured motorist carrier's subrogation right granted by O.C.G.A. section 33-7-11(f)." Frank E. Jenkins III & Wallace Miller III, Limited release does not extinguish UM carrier's subrogation right, Ga. Auto. Ins. L. § 40:9 (2023–2024 ed.). "The UM carrier's right of

subrogation survives the execution of a limited release, even though the UM carrier's subrogation right is not expressly reserved within the limited release." Id.

For example, in Ramos-Silva v. State Farm Mut. Ins. Co., Mary Reddy settled with a tortfeasor's insurer after a collision. 686 S.E.2d 345, 346 (Ga. Ct. App. 2009). The parties signed a limited release pursuant to O.C.G.A. § 33-24-41.1, which released the tortfeasor's insurer completely and released the tortfeasor from liability "except to the extent other insurance coverage" was available that covered Reddy's claims against the tortfeasor. Id. at 346. "Following Reddy's settlement" with the tortfeasor, Reddy's insurer paid Reddy $75,000 pursuant to the UM provision of her auto insurance policy. Id. Then Reddy's insurer filed an action against the tortfeasor seeking subrogation for the money paid to Reddy. Id. The Georgia Court of Appeals held that Reddy's insurer's subrogation rights were not extinguished by a release pursuant to O.C.G.A. § 33-24-41.1. Id. at 347. The court reasoned that extinguishing subrogation rights after the execution of a limited release would be inconsistent with Georgia law and with an equitable purpose of subrogation—"to deter wrongdoing by placing the ultimate responsibility" for payment on the one at fault. Id. at 347–48.

Here, Mid-Century did not make a payment to Stafford before Stafford and the tortfeasor executed a limited release. But neither did the UM insurer in Ramos-Silva. 686 S.E.2d at 346. Under Georgia law, Mid-century's subrogation rights survived the Limited Release pursuant to O.C.G.A. § 33-24-41.1.[4] Thus, under the facts and circumstances of the case, Stafford's Limited Release complied with Lambert by expressly preserving Mid-Century's subrogation rights.

---

[4] This Court is not deciding the substantive claims underlying the Limited Release. Instead, this Court is determining whether Mid-Century's subrogation rights were preserved by the Limited Release. Whether Mid-Century brings an action against the tortfeasor in Alabama or Georgia, Georgia substantive law should apply. Under Alabama law, contractual choice-of-law provisions are generally enforceable. See Stovall v. Universal Const. Co., Inc., 893 So. 2d 1090, 1102 (Ala. 2004). Here, the Limited Release was created pursuant to a Georgia law and is to be construed in

Turning to <u>Lambert</u>'s general rules, step one required Stafford to give Mid-Century notice "as soon as it appear[ed] that the insured's damages may exceed the tortfeasor's limits of liability coverage." <u>Lambert</u>, 576 So. 2d at 167. Here, less than four months after the accident, Stafford sent a demand letter to Mid-Century requesting uninsured/underinsured motorist compensation under the Policy. (Doc. 1 at 2 ¶ 4; Doc. 1-4 (Demand Letter); Doc. 19 at 1 ¶ 4). The letter stated: "**[I]t has become clear that the at-fault party's bodily injury coverage is inadequate to fully compensate for the damages incurred.**" (Doc. 1-4 at 3 (Demand Letter)).[5] Step two required Stafford to give notice of a proposed settlement "if the settlement would release the tort-feasor from all liability." <u>Lambert</u>, 576 So. 2d at 167. Here, the settlement did not release the tortfeasor from all liability. Therefore, Stafford's settlement complied with rules one and two.

The rest of <u>Lambert</u>'s rules are inapplicable to the facts of the case because the Limited Release preserved Mid-Century's subrogation rights. Here, Mid-Century was not required to take any action to preserve its subrogation rights. Mid-Century was not required to "advance to its insured an amount equal" to the tortfeasor's settlement offer to protect its subrogation rights. <u>Lambert</u>, 576 So. 2d at 167. And Mid-Century did not have to choose between "waiv[ing] its right of subrogation against the tort-feasor, or . . . deny[ing] any obligation to pay underinsured motorist benefits." <u>Id.</u>

_____

accordance with Georgia law. Even if this provision did not control, Alabama law's *lex loci* rules would likely require application of Georgia law to the substantive claims against the tortfeasor. <u>See</u> <u>Lifestar Response of Ala., Inc. v. Admiral Ins.</u>, 17 So. 3d 200, 213 (Ala. 2009). "Under the principle of *lex loci delicti*, an Alabama court will determine the substantive rights of an injured party [asserting a tort claim] according to the law of the state where the injury occurred." <u>Id.</u> (citing <u>Fitts v. Minn. Mining & Mfg. Co.</u>, 581 So. 2d 819 (Ala 1991)). Here, the accident occurred in Georgia. (Doc. 31-1 (Accident Report)).

[5] Compromise offers and negotiations are not admissible to prove or disprove the validity or amount of a dispute claim or to impeach by a prior inconsistent statement or a contradiction. Fed. R. Evid. 408(a). But the letter is admissible to prove that Mid-Century had notice from Stafford that his damages might exceed the tortfeasor's limits of liability coverage. <u>See</u> Fed. R. Evid. 408(b) (explaining that "the court may admit evidence of negotiations for another purpose, such as . . . negating a contention of undue delay").

Because Mid-Century's subrogation rights were preserved, it "would serve no purpose" to require that Stafford or Mid-Century follow these rules. See Aetna Cas. & Sur. Co., 662 So.2d at 241.

Mid-Century's reliance on Allstate Insurance Co. v. Beavers, 611 So. 2d 348 (Ala. 1992) and Ex parte Morgan, 13 So. 3d 385 (Ala. 2009) is misguided. As required by Lambert, "any procedure must take into consideration the facts and circumstances of each individual case." 576 So. 2d at 167. In Beavers, the insured failed to "notify his carrier of his settlement with the alleged tort-feasor until after he had settled and executed a release." Beavers, 611 So. 2d at 351. The Alabama Supreme Court held that the insured "waived his right to uninsured motorist insurance benefits" by settling with the tortfeasor without notifying his insurer of his intent to settle under his policy. Id. at 353. But these facts are different from the present case. In Beavers, the insured's settlement with the tortfeasor's insurer released the tortfeasor "from all liability." Id. at 353. Here, the Limited Release expressly preserved Mid-Century's subrogation rights against the tortfeasor.

In Ex parte Morgan, the insureds settled their claim against the underinsured motorist without obtaining the consent of their underinsured motorist carrier. Ex parte Morgan, 13 So. 3d at 386. The trial court denied the insureds' underinsurance claims because of the insureds' failure to give their insurer "reasonable notice" of their intent to settle. Id. The Alabama Court of Civil Appeals affirmed, concluding that the insureds failed to comply with the "reasonable time" standard in Lambert. Id. at 388. The Alabama Supreme Court affirmed, reasoning that the insurer had not waived its rights under its policy to consent to or object to the proposed settlement. Id. at 390. Again, the facts and circumstances of Ex parte Morgan are different from the present case. In Ex parte Morgan, the insured "executed a general release" in violation of Lambert's rules. Id. at 387. Here, Stafford executed a limited release, not a general release, which preserved Mid-Century's subrogation rights against the tortfeasor.

Finally, <u>Lambert</u>'s rules do not give Mid-Century a "right to front the settlement funds so that the tortfeasor has to defend the suit at the tortfeasor's expense, thus relieving Mid-Century from defense costs." (Doc. 31 at 9–10). In violation of S.D. Ala. CivLR. 56(a),[6] Mid-Century cites no legal authority in support of this assertion—only an affidavit of its claim handler stating he is aware of the lawsuit and the motor accident. (Doc. 31-4). Moreover, the Court is not aware of any Alabama caselaw that supports Mid-Century's proposition. Mid-Century has not proven that it has a "right to front the settlement funds" that relieves it "from defense costs." (Doc. 31 at 9–10).

In sum, Stafford's failure to notify Mid-Century of the settlement violated the Policy's consent-to-settle requirements. But <u>Lambert</u> guides courts to limit consent-to-settle clauses through "both legal and equitable principles." <u>Lambert</u>, 576 So. 2d at 166 ("[W]e have not held that consent-to-settle and subrogation clauses are void, but we have placed many restrictions on their enforceability."). "[A]s a matter of public policy, [the Alabama Supreme Court] has held that an injured party's settlement with a tortfeasor without the consent of the injured party's UIM insurance carrier does not necessarily preclude the injured party from recovering UIM benefits." <u>Turner</u>, 310 So. 3d at 359. In compliance with <u>Lambert</u>, Stafford preserved Mid-Century's subrogation rights. Therefore, it would be inconsistent with <u>Lambert</u> to preclude Stafford's recovery of UIM benefits. Mid-Century has failed to prove that it is entitled to summary judgment on this issue.

### B.   **Stafford's Motion for Summary Judgment**

Stafford's motion for summary judgment argues that he was not required to provide notice to Mid-Century concerning a potential settlement with the tortfeasor and that "his failure to do so

---

[6] "The movant must file a brief that includes: (1) all facts relied upon, each supported by a specific, pinpoint citation to the record; and (2) argument supported by legal authority as appropriate." S.D. Ala. CivLR. 56(a).

does not relieve Mid-Century of its obligation to provide underinsured motorist benefits to [him]." (Doc. 33 at 6). In support, Stafford recites a purpose of consent-to-settle clauses in the underinsured motorist insurance context: "to protect the underinsured motorist insurance carrier's subrogation rights against the tort-feasor." Lambert, 576 So. 2d at 167. Stafford contends that his "Limited Liability Release specifically preserves Mid-Century's subrogation rights against the tort-feasor." (Doc. 33 at 5). Stafford also argues that "Mid-Century is actually in a better position here than it otherwise would be under Alabama law" because "Mid-Century was not forced to decide whether to consent to the settlement or front the settlement money to Mr. Stafford to preserve its subrogation rights." (Doc. 33 at 5–6). In short, Stafford argues that the Policy was ambiguous and that he preserved Mid-Century's subrogation rights in the Limited Release.

Mid-Century's response argues that "Stafford cannot prove that he is entitled to underinsured motorist coverage" because "he settled his claim with the tortfeasor without giving Mid-Century prior notice and opportunity to protect its subrogation interest and to avoid incurring attorney fees." (Doc. 35 at 6). In support, Mid Century argues that Alabama law requires compliance with insurance-notice requirements as a condition precedent to the insured recovery under the policy. (Id.). Mid-Century argues that "Stafford failed to give notice to Mid-Century as soon as it appeared that his damages might exceed the tortfeasor's limits of liability coverage." (Id. at 8).

### 1. The Policy's requirements

As explained, Stafford's failure to obtain Mid-Century's consent before accepting the settlement violated the Policy. See supra Section III.A.1. But that does not necessarily preclude Stafford from recovering UIM benefits. Turner, 310 So. 3d at 359 ("[A]s a matter of public policy, [the Alabama Supreme Court] has held that an injured party's settlement with a tortfeasor without the consent of the injured party's UIM insurance carrier does not necessarily preclude the injured

party from recovering UIM benefits."). The issue is whether Stafford is entitled to UIM benefits despite his failure to obtain Mid-Century's consent before settling.

### 2. Alabama law's public policy

In Lambert, the Alabama Supreme Court placed public policy limitations on the enforceability of consent-to-settle clauses in the UIM context. 576 So. 2d at 166. Thus, "an injured party's settlement with a tortfeasor without the consent of the injured party's UIM insurance carrier does not necessarily preclude the injured party from recovering UIM benefits." Turner, 310 So. 3d at 359. "The insured, by acceptance of a policy, is deemed to have approved it with all conditions and limitations expressed therein which are reasonable and not contrary to public policy." Id. at 358 (quoting Gowan, 218 So. 2d at 693).

Preventing Stafford from receiving UIM benefits—even though Mid-Century's subrogation rights were preserved—would be contrary to public policy. The Alabama Supreme Court has explained that "the competing principles in [Lambert] were the insured's right to settle and the insurer's right to subrogation." Aetna Cas. & Sur. Co., 662 So. 2d at 240. Here, Stafford's right to settle must be balanced with Mid-Century's right to subrogation. Stafford settled without giving notice to or consent from Mid-Century. But Stafford's settlement preserved Mid-Century's subrogation rights. And as explained, the settlement complied with Lambert. See supra Section III.A.2. Therefore, Stafford's settlement with the tortfeasor does not preclude Stafford from recovering UIM benefits, and Stafford is entitled to summary judgment on this issue.

### IV.   Conclusion

The ultimate issue is whether Mid-Century owes Stafford coverage under the Policy. Stafford's Limited Release complies with Alabama law by preserving Mid-Century's subrogation rights. Further, it would be against Alabama public policy to reject Stafford's right to coverage when

Mid-Century's subrogation rights were not prejudiced. Mid-Century's summary judgment is **denied**. Stafford's summary judgment is **granted**.

   **DONE** and **ORDERED** this **23rd** day of **August 2024**.

         **<u>s / Kristi K. DuBose</u>**
         **KRISTI K. DuBOSE**
         **UNITED STATES DISTRICT JUDGE**